Argued March 3, affirmed April 5, 1921.

# BAGOT v. INTER–MOUNTAIN MILLING CO.

(196 Pac. 824.)

**Corporation—Can Act Only Through Its Officers and Agents.**

1. A corporation can act only through its officers and agents.

**Corporations—One Relying on Contract With Corporate Agent has Burden of Proving Authority.**

2. Plaintiff who relied on a contract entered into with an agent of the defendant corporation has the burden of showing such agent's authority, or of facts which would estop the corporation from denying it.

**Principal and Agent—Existence of Authority Question of Fact, Extent One of Law.**

3. The existence of· an agent's authority is a question of fact, but what he may do by virtue of it is a question of law.

**Frauds, Statute of—Contract for Sale of Flour in Excess of $50 Void in Absence of Part Payment, Written Evidence, or Partial Performance.**

4. Under Section 808, subdivision 5, Or. L., a contract for the sale of several carloads of flour, being in excess of $50, is void, in the absence of part payment, written evidence, or partial performance.

**Principal and Agent—Traveling Salesman has no Ostensible Implied Authority to Make Binding Contract.**

5. A traveling salesman or drummer ordinarily has no ostensible or implied authority to make a binding contract without the approval of his principal; the extent of his authority being merely to solicit orders and transmit the same to his principal for acceptance.

**Sales—Order Given Traveling Salesman Revocable Until Accepted.**

6. As a traveling salesman has no ostensible authority to bind his principal, an order given such traveling salesman or drummer is revocable until acceptance, and until acceptance or confirmance, the prospective buyer cannot enforce the same.

**Principal and Agent—Evidence Insufficient to Show Any Binding Contract of Sale, it Merely Appearing That an Order was Given a Traveling Salesman.**

7. Where defendant had already quoted a price to plaintiff in excess of the price specified in its flour order given a traveling

---

5. Power of traveling salesman to make binding contract of sale, see note in Ann. Cas. 1912B, 356.

6. On right to withdraw order given to agent before acceptance by principal, see note in 10 L. R. A. (N. S.) 1138.

On acknowledgment by seller of receipt of order for goods as an acceptance, see note in 38 L. R. A. (N. S.) 903.

salesman, who, defendant had advised plaintiff, would shortly call on him, and defendant repudiated the order when it was called to its attention, evidence *held* insufficient to show binding contract; there being nothing to show that the agent was either held out directly or by past dealings as having authority to bind defendant by accepting orders.

From Multnomah: ROBERT TUCKER, Judge.

Department 1.

At the times alleged, W. R. Bagot was doing business in the City of Portland, Oregon, under the firm name of W. R. Bagot & Co., and duly executed and filed his firm certificate with the county clerk. The defendant was a corporation organized and existing under the laws of the State of Montana, but was not licensed to do business as a foreign corporation in this state. In the first cause of action it is alleged that between February 25 and March 25, 1919, plaintiff and defendant entered into a contract in which the corporation agreed to furnish and deliver to Bagot when requested, at Portland, Oregon, two carloads of Mountain Pride flour of four hundred barrels each, at the agreed price of $9.50 per barrel, and that plaintiff agreed to purchase, accept, and pay $9.50 per barrel for the two carloads upon such delivery. It is alleged that plaintiff has requested such delivery and that defendant has failed and refused and still refuses to deliver the flour or any portion of it; that by reason thereof plaintiff has been damaged in the sum of $2,496. For a second cause of action, the plaintiff alleges another and different contract between the same dates and for a like amount of flour at the same price and a breach of that contract and for the same amount of damages.

For answer, the defendant admits the firm name and corporation as stated in the complaint, and for a further and separate answer, alleges that it "em-

ploys a traveling salesman who solicits orders for flour within the State of Oregon''; that his authority is limited in this, ''that all orders taken by him are subject to the approval of and confirmation by the head office of the defendant at Townsend, Montana, and if any order is approved and confirmed by said head office, then said order is filled by shipment to the customer''; ''that plaintiff had full knowledge of the limited authority of said defendant's salesman''; that during the year 1919, plaintiff gave to defendant's salesman an order for two carloads of flour at the price of $9.50 per barrel; that the order was not confirmed by defendant and that plaintiff was at once notified that it would not be accepted at that price; that in March, 1919, plaintiff requested defendant to ship one car of flour on such order, and that it again notified the plaintiff that it had not confirmed or accepted the previous order and would not do so, but advised him that if he had sold any of the flour on the strength of such order that it would furnish him one car of flour at $9.75 per barrel; ''that on the first day of April, 1919, plaintiff notified defendant that plaintiff would accept said offer, and thereafter defendant shipped to plaintiff one carload of flour at the said price of $9.75 per barrel.''   The reply denies all of the new matter, and further alleges that during such times the defendant held out and represented that its traveling salesman had authority to quote prices of the sale of flour and to solicit and accept orders and to bind the defendant to deliver the flour sold by its salesman at the prices which he quoted, and that its salesman as agent of the defendant quoted the plaintiff the price of $9.50 per barrel; that plaintiff relied on the acts of the defendant in holding out its salesman as

having such authority and by reason thereof placed its order for said two carloads which was accepted by the salesman; "that the defendant at all times knew that the plaintiff relied on the defendant's acts in holding said salesman out as having authority to quote prices for said flour, accept orders therefor, at the prices quoted, and to bind the defendant to sell and deliver the flour at the prices quoted"; and that the defendant knew that the plaintiff would not have placed such orders with its agent without relying upon such acts and representations; that by reason thereof it "is estopped from alleging or denying that said salesman or agent did not have authority to accept the aforesaid orders of the plaintiff for and on behalf of the defendant for said two carloads of flour at $9.50 per barrel, and from denying its contract with the plaintiff to sell and deliver said flour at said price."

Upon such issues the cause was tried to a jury, and at the conclusion of plaintiff's testimony, the defendant moved for a nonsuit, which was sustained and judgment was rendered in favor of it for the costs and disbursements, from which the plaintiff appeals, assigning as error the granting of such motion and the refusal to submit the case to the jury.                                   AFFIRMED.

For appellant there was a brief over the name of *Messrs. Perkins & Bailey,* with an oral argument by *Mr. George J. Perkins.*

For respondent there was a brief over the names of *Mr. Frank S. Grant* and *Mr. Fred W. Schmitz,* with an oral argument by *Mr. Grant.*

JOHNS, J.—It is admitted that McKinnon was the salesman of the defendant. The plaintiff claims that he had general powers and full authority to fix the price and to take, accept and confirm orders for flour, and that through him the plaintiff entered into a contract with the defendant for the purchase and sale of 800 barrels of flour to be delivered at Portland, at the agreed price of $9.50 per barrel; that later it entered into another and different contract for the same amount of flour and at the same price. Plaintiff also claims that the defendant held out and represented to the plaintiff that McKinnon had general authority, and that by its actions and conduct it induced and led the plaintiff to believe that he was authorized to make and carry out such contracts, and that relying thereon, plaintiff entered into such contracts, and that by reason of its actions and conduct, the defendant is now estopped to deny the authority of its agent.

1, 2. The defendant admits that McKinnon was its agent but claims that his authority was limited; that he did not have the power to bind the company and that any orders which he took were taken subject to its approval and did not become valid or binding as a contract without its approval, and that it declined to accept or confirm such orders and promptly notified the plaintiff of its refusal; in other words, that there never was any valid or binding contract between the plaintiff and the defendant for the sale and purchase of the flour in question. The defendant is a corporation and can act only through its agents or officers and the burden of proof was upon the plaintiff to show that McKinnon was authorized to make such contracts, or that by its conduct the defendant is estopped to deny his authority. It is a Montana

corporation and its principal office and place of business was at Townsend, in that state, and the alleged contracts were made in Portland, Oregon. In *Baker v. Seaweard,* 63 Or. 350 (127 Pac. 961), this court held:

"A principal is not bound by the acts of his agent, unless within the real or apparent scope of such agent's authority.

"One dealing with an agent is bound at his peril to ascertain the extent of the agent's authority, and is chargeable with knowledge thereof. * *

"Where an agency is proved or admitted, it is the duty of the court to determine whether or not a particular act was within the agent's authority.

"Where plaintiff's testimony that a person left in charge of sheep owned by him was authorized to sign his name to checks only for the purpose of paying herders, for provisions, and ordinary expenses for the care of the sheep, was uncontradicted, and a person from whom such agent purchased horses had no knowledge or information as to his authority, except the agent's representations, the court should have held that the agent had no authority to purchase such horses, instead of submitting that question to the jury.

"For a principal to be bound by the acts of his agent in excess of his authority, it must appear that he held the agent out to the public in other instances as possessing authority embracing the act in question, or that he knowingly acquiesced in the agent's assertion of the requisite authority, and that the party dealing with the agent had reason to believe, and did believe, that the agent had the necessary authority."

3. The existence of an agent's authority is a question of fact; what he may do by virtue of it is a question of law: *Glenn v. Savage,* 14 Or. 567 (13 Pac. 324).

4. Section 808, subdivision 5, L. Or., says:

"The agreement is void unless the same or some note or memorandum thereof expressing the consideration be in writing and subscribed by the party to be charged, or by his lawfully authorized agent," where it is "an agreement for the sale of personal property at a price not less than $50 unless the buyer accept and receive some part of such personal property, or pay at the time some part of the purchase money; * * "

It is not claimed that any money was ever paid or that there was any specific written contract or that any portion of the flour in question was ever delivered. In the absence of such payment, written evidence or partial performance, the contracts would be void under the statute.

On January 30, 1919, at Townsend, Montana, the defendant mailed a letter to the plaintiff about some previous business dealings, in which among other things it said:

"We are taking the matter up with our salesman who makes the western towns and any information we get, will surely advise you. No doubt our Mr. McKinnon will call on you in the near future. You will find him a splendid fellow, * * "

On February 20th, the defendant wired the plaintiff:

"Nine seventy-five best we can do on Mountain Pride quality."

On February 22d, the plaintiff wrote the defendant:

"We are in receipt of your wire of yesterday stating that $9.75 was the best you could do on Mountain Pride Flour, the which we regret as we were compelled to pass the business we had in hand, but suppose we must expect these things from time to time."

McKinnon called upon the plaintiff, "Monday morning, the 24th of February." While there during the week together they visited prospective purchasers of defendant's flour, in the City of Portland, but no business was transacted and no orders were placed. On Friday night of that week, and while McKinnon was there at his father's house, the plaintiff testifies:

"I rang him up on the telephone and he said he was going out that night, I think at 11 o'clock. * * I says, 'You can book us two cars of flour at nine and a half.' He was very much pleased and he said, 'I will confirm this but, if you don't mind, I would like you to wait until I go on the train or get along; I am going to Seattle and to-morrow I will confirm this.' Owing to the fact that McKinnon was then at home and at dinner with his family, I said that was perfectly satisfactory."

On March 8th, the plaintiff wrote the defendant:

"We enjoyed your Mr. McKinnon's visit and have been expecting a line from you confirming the business given him and also your expressions regarding the conditions he found here."

On March 15th, from Townsend, Montana, McKinnon wrote the plaintiff:

"Mr. Thorson and I have figured out the price proposition on the Flour and have booked the two cars at $9.50, but we can't shave this; in fact, can't accept any more at this price; it is too close."

March 20th, for the attention of Mr. McKinnon, the plaintiff wrote the defendant:

"We also note that you say you have booked us two cars at $9.50, which we take as an acknowledgment of the order wired you a few days ago. This, of course, is in addition to the order for two cars we gave you when you were here."

March 28th, the defendant by its manager acknowledged the receipt of plaintiff's letter of March 20th, saying:

It "would have been answered sooner but the writer has been confined to the house for several days. We also note shipping instructions on car of 400 barrels. Now according to our records we have no Flour booked with you. If you will refer to telegrams which passed between us on February 19th and 20th, you will see we could not accept your offer of $9.50 per barrel, $9.75 was the best we could do and our salesman, Mr. McKinnon was entirely in error in confirming these. If you have this flour sold we will be glad to furnish one car, the one you have furnished shipping instructions for at $9.75, in line with our telegram."

March 31st, the plaintiff sent the following telegram to the defendant:

"Wire date of shipment three hundred Mountain Pride and hundred in Barkers sacks ordered our wire twenty-first and letter twenty-second February Buyer pressing for delivery."

April 1st, the defendant wired the plaintiff:

"Your telegram received see our letter March twenty-eighth and advise."

In answer to that telegram, on the same day, the plaintiff wired the defendant:

"Forward immediately one car Mountain Pride according to shipping instructions already given price nine seventy-five send draft through First National Bank or United States National Bank too much delay through Federal Reserve."

This car was shipped, received and paid for at $9.75 per barrel, and was the only car defendant ever shipped to the plaintiff after McKinnon's visit to Portland. The plaintiff testifies:

"Q. That is the only thing you ever received, so, as a matter of fact, Mr. Bagot, in this dealing with the Inter-Mountain Milling Company you have no order, signed or otherwise, with the Inter-Mountain Milling Company, over their signature, have you?

"A. No.

"Q. And your claim is simply made for damages by reason of the fact that you assume that Mr. McKinnon had authority to confirm orders?

"A. Well, if you put it that way, yes.

"Q. But supposing I call as a salesman?

"A. We would want to know who you were, and naturally you would state what your business was. That is customary. We have been doing that the last thirty years. I never had a case like this before; never heard of one. This is the first case I have heard of.

"Q. Did you not treat, Mr. Bagot, this as rather an unusual occurrence, a thing of this kind?

"A. I took Mr. McKinnon at his word.

"Q. And, as a matter of fact, that is the only thing you did do, isn't it, Mr. Bagot? You have simply been dealing with Mr. McKinnon all through this case.

"A. As the representative of the Inter-Mountain Milling Company.

"Q. You say, 'As the representative of the Inter-Mountain Milling Company'; you assume that; that is your own assumption isn't it?

"A. From his statement.

"Q. Now, you say that you took Mr. McKinnon's word for everything, assuming that he had complete power to bind the company or anything regarding the sale of flour?

"A. Yes.

"Q. Well, why, then, do you ask the Mill company to confirm what he did?

"A. I said that I expected to receive a confirmation of what Mr. McKinnon promised to give me the day I gave him the order.

"Q. But the previous order from the mill was $9.75, was it not—the previous quotation?

"A. The previous order was $9.75 prior to Mr. McKinnon's visit.

"Q. That telegram of April first, you say, was in direct answer to that letter of March 28th that you got. from—

"A. (Interrupting.) Yes.

"Q. Yes. Well, in these various letters that you had gotten from the Inter-Mountain Milling company, Mr. Bagot, there was no reference, was there, as to the authority of Mr. McKinnon to sell flour, was there, and bind the company?

"A. No.

"Q. And you simply assumed those things, that is, the authority which you say he had, by reason of what he told you?

"A. Absolutely."

The plaintiff testified that upon McKinnon's visit to Portland:

He "offered to sell and book orders then and there to the bakers as though he had authority without any confirmation from the mill, and he made us out a price at the beginning of the time, although the last price by wire from the mill was nine seventy-five, when he got on the ground he found that that price,— that others were offering less, and he immediately made us a price of nine dollars and a half per barrel and tried to sell on that basis until the Friday evening when he went away; * * but the whole of his attitude, from the time he arrived until the time he went away, was one of authority, and never for a moment did he discuss the necessity of wiring the mill for authority, * * but during the time he was here there was no orders booked; he was not successful in booking a single barrel at the price he was offering, namely, nine dollars fifty cents per barrel."

It will be noted that plaintiff placed his order with McKinnon over the phone on the night of February 28th, and that he was to confirm the order on the following day, which he never did, and that the only

time which the plaintiff heard from McKinnon was on March 15th, which is the letter from Townsend, Montana, above quoted. Although it is true this was written from the home office of the defendant and upon its stationery, yet it is a personal letter of McKinnon's. It is not signed by the company, and, outside of the place where it was mailed, there is nothing to indicate that it was written for the company, and the stubborn fact remains that no flour was ever shipped under the McKinnon order. The McKinnon letter of March 15th was followed by the letter of March 20th, from the plaintiff to the defendant, which brought the letter of the defendant to the plaintiff of March 28th, in which it is said:

"Now according to our records we have no flour booked with you. If you will refer to telegrams which passed between us on February 19th and 20th, you will see we could not accept your offer of $9.50 per barrel; $9.75 was the best we could do and our salesman, Mr. McKinnon was entirely in error in confirming these."

That is the first letter from the defendant to the plaintiff after McKinnon's Portland visit. Upon receipt of plaintiff's wire of March 31st inquiring about the date of shipment of flour ordered by wire on February 21st, and confirmed by letter of the 22d, the defendant wired "your telegram received see our letter March twenty-eighth and advise," and it was in response to defendant's letter of March 28th, and its wire of April 1st, that the plaintiff placed his order for one car of Mountain Pride at $9.75 per barrel which was shipped, accepted and paid for at that price. It will thus be seen that the defendant never did confirm plaintiff's phone order placed with McKinnon at $9.50 per barrel, refused to recognize it

or to ship any flour under it and specifically notified the plaintiff of its refusal. Upon the receipt of such notice and on April 1st, the plaintiff then placed his order for one car of flour at $9.75 per barrel.

After the receipt of and payment for that carload and on April 7th, the plaintiff wired the defendant:

"Parties to whom we sold Mountain Pride are demanding delivery unless you advise us by wire immediately when shipment will be made please be advised that we will go into open market and buy equal quality flour to fill our sales any difference in cost will be charged to you."

That was the first notice of any kind of the plaintiff's intention to hold the defendant liable upon the alleged contracts. It will also be noted that in its letter of January 30th the defendant wrote the plaintiff:

"We are taking the matter up with our salesman. * * No doubt our Mr. McKinnon will call upon you in the near future. You will find him a splendid fellow," etc.

5, 6. This letter advised the plaintiff, in substance, that defendant's salesman would call upon the plaintiff in the near future, and that he would find him a splendid fellow, no more no less; and that was the only notice which the plaintiff ever had from the company as to McKinnon's authority. It did not advise plaintiff that McKinnon had authority to fix prices or to make or confirm contracts. The home office of the defendant was in Townsend, Montana, and in the very nature of things the plaintiff knew that McKinnon was a traveling salesman, and that as such, his authority was limited to the taking of orders subject to the approval of his company. R. C. L., Volume 24, Section 673, says:

"In case of a traveling salesman or drummer it is the general rule that he has no ostensible or implied

authority to make a binding contract of sale without the approval or acceptance of his principal. The extent of his authority is merely to solicit orders and transmit the same to his principal for acceptance, but of course he may be clothed with ostensible authority to make binding contracts of sale and where the principal, by a previous course of dealing has held out the traveling salesman as having authority to make contracts of sale and to fix prices and terms, the principal will be bound by the acts of the salesman.''

In the instant case, plaintiff sought to have the defendant confirm McKinnon's alleged contracts and there is no evidence of any previous dealings with him. In a note to the above case, the author cites *Bauman* v. *McManus,* 75 Kan. 106 (89 Pac. 15, 10 L. R. A. (N. S.) 1138), which holds:

''Since, in the absence of evidence to the contrary, the presumption is that an order for goods taken by a commercial traveler is subject to the approval of the house which he represents, no contract results until such order is accepted. The proposed buyer has an unqualified right to withdraw such an order any time before it is accepted.''

In the L. R. A. notes to the case, it is said:

''The general rule is that a mere offer to buy, or order for goods, is revocable until accepted by the seller. Consequently an order given to the seller's agent is not a contract to purchase until accepted by the seller, but merely a proposal subject to withdrawal at any time before acceptance.''

*Courtney Shoe Co.* v. *Curd & Son,* 142 Ky. 219 (134 S. W. 146, 38 L. R. A. (N. S.) 903), is also in point.

7. If the plaintiff had the legal right to cancel the McKinnon order at any time before it was confirmed, it must follow that his order did not become a valid

and binding contract until such time as it was approved by the defendant. The plaintiff had written notice from the defendant that McKinnon was its salesman. There is no evidence that the defendant ever knew of any of the statements or representations which McKinnon made to the plaintiff as to his authority to make or confirm contracts or that it ever ratified or approved any of his alleged statements or representations. No money was ever paid and McKinnon's personal letter from Townsend, Montana, of March 15th, is the only writing which could be construed as referring to the phone order placed with him at Portland, on February 28th, and when the contents of that letter were called to the attention of the home office, it promptly disaffirmed it and refused to ship any flour at less than $9.75 per barrel, and then only for the purpose of filling orders which the plaintiff then had from his Portland customers. In the instant case there were no previous dealings or rule of conduct with the agent or anything to take the transactions out of the ordinary course of business, and at that time the price of flour was mercurial, with an upward tendency. As we construe the record, the plaintiff was not forced to buy and the defendant would not be required to sell until the orders were confirmed by the defendant, and there is no evidence from which the jury could find that they were ever accepted or approved.

Judgment affirmed.                    AFFIRMED.

BURNETT, C. J., and McBRIDE and HARRIS, JJ., concur.