Argued January 15; reversed and remanded February 17, 1931

# HELD *v.* PUGET SOUND & ALASKA POWDER CO.
### (295 P. 969)

.   *C. O. Fenlason,* of Portland (J. M. Hickson, of Portland, on the brief) for appellant.

*John L. Foote,* of St. Helens, and *Q. A. Kaune,* of Everett, Wash., for respondent.

KELLY, J.  For several years beginning sometime about 1924, plaintiff has operated a rock quarry near the city of Rainier in Columbia county, Oregon.  It was plaintiff's practice to have rock blasted from this quarry.  Among those engaged in this business, a single operation consisting of the preparation of the necessary tunnels, placing explosives therein, wiring the

same for the purposes of ignition, closing the tunnels by back filling and causing an explosion is termed a "shot."

Defendant is a corporation organized under the laws of the state of Washington with a branch office in Portland, Oregon.

Plaintiff claims that, in consideration of the purchase from defendant by plaintiff of the explosive therein, defendant guaranteed that a certain "shot" which was placed in plaintiff's quarry in December, 1928, and January, 1929, would be successful. Said "shot" did not explode satisfactorily, if at all. This action was instituted to recover damages which plaintiff alleges he thereby sustained.

The circuit court sustained a motion interposed by defendant for a directed verdict in favor of defendant. From the judgment of dismissal based upon such verdict, plaintiff appeals.

The one question presented by this appeal is whether there is any testimony in the record tending to prove that Mr. George Levy had authority from defendant to guarantee that the "shot" of December, 1928, and January, 1929, would be successful. The plaintiff testified that Mr. Levy made such an agreement. Transcript of Testimony, p. 6.

There is testimony to the effect that in the summer of 1925, Mr. Roy Hobart and Mr. Levy called upon plaintiff and on that occasion Mr. Hobart offered to guarantee a satisfactory "shot." Transcript of Testimony, p. 3. The offer was accepted. Mr. Hobart and Mr. Levy both superintended loading the powder into the tunnel and wiring the powder. The "shot" was successful: Transcript of Testimony, p. 4. Mr. Hobart in his testimony admits making this guaranty, but says that it was personal to him and not in behalf of the defendant.

There is testimony to the effect that in the spring of 1926, it again became necessary for plaintiff to have more rock moved. The plaintiff testified:

"Mr. Hobart and Mr. Levy called again in regard to another shot and during our conversation I told them I was about ready to drive another tunnel. They said, 'Well, whenever you are ready we would like to get your business again.' I said, 'What is your proposition,' and Mr. Hobart said, 'The same as before.' And I said, 'What do you mean by that?' And Mr. Hobart said, 'We will guarantee a satisfactory shot providing that we take care of the loading and wiring of the tunnel.' I said, 'All right, while you are here, you might just as well locate this tunnel.' So we walked out to the quarry and they picked out the site of the 'shot' and measured the height and computed the length and got the tunnel started in the proper location. This was all done under their jurisdiction. The tunnel was put in where they located it. They figured the quantity of powder to be used and came down and loaded it in the tunnel and wired the shot and helped place the back filling. When it was all completed and ready to be shot, Mr. Hobart pulled the battery and shot the shot but with no results. It only blew the back filling out": Transcript of Testimony, pp. 5 and 6.

The plaintiff further testified as follows:

"Q. Then what happened after this bad shot, if anything?

"A. Well, after the shot had gone off without any results I spoke to Mr. Hobart and said, 'Now, what do you do?' Mr. Hobart said, 'You will have to clean out the tunnel and we will reshoot the shot and I guarantee that it will be satisfactory'."

Continuing * * * "they reloaded the tunnel with 6,000 pounds of their powder instead of the 2,000 pounds used at first, and the second shot was a very successful shot. It brought down considerably more than we had figured on."

"Q. Was there an adjustment on that shot?

"A. Yes, sir.

"Q. Who figured on the 6,000 pounds of powder?

"A. Mr. Hobart and the other salesman.

"Q. He and Mr. Levy?

"A. The both of them did together, yes.

"Q. What was the next dealings you had with the defendant here.

"A. The next dealings was when we made the settlement on this shot.

"Q. I mean after the second shot. What dealings did you have after that?

"A. After I had made settlement for the second shot, I didn't see them again until sometime in 1928. Mr. Levy called on me early in the fall of that year and during our conversation, I brought out the fact that it was going to be necessary to put in another tunnel pretty soon because I had more rock orders coming up and didn't have enough rock loose to fill the orders and Mr. Levy said, 'I would like to get the business.' In the meantime I had asked about Mr. Hobart because they were usually both together and he had said, 'Mr. Hobart should be with us in a short while. He has gone East and when he left he was going to be back in a few months.' I said, 'Is that so?' And Mr. Levy said, 'Yes.' And then I said, 'Are you still doing business as you always did? The same as we have been doing? You represent the company do you not?' He said, 'You bet. I will guarantee that we get results as we always did.' He said, 'We will take care of you as we always have done. I will do the shooting as we have always done and with the same understanding.' We talked about it for a while, about the location of the tunnel and the rest. Mr. Levy and myself measured what was to be the length of the tunnel and I believe that Mr. Russell was there, too. I told him, 'It won't be long now until we start the tunnel'."

There is a letter in evidence dated February 15, 1928, upon the stationery and carrying the typewritten

signature of the defendant by Mr. Hobart, addressed to The Sand and Gravel Company, box 267, Kelso, Washington, containing this offer:

"If you would consider using our quarry powder and let us come out and aid you in estimating the proper amount of powder to load into your tunnels and allow us to aid in wiring, etc., we would guarantee your shot to be a success."

Supplementing this, witness Schrader, who is connected with the addressee of said letter, testified that, shortly after the receipt of this letter, Mr. Levy called and verbally repeated an offer of guaranty. There is testimony which tends to show that Mr. Levy came to the quarry of plaintiff; that he aided in estimating the proper amount of powder to load into plaintiff's tunnel, and also aided in wiring for the shot in question.

The president of defendant testified to an offer of guaranty made several years ago to the Long-Bell company. There is no evidence in the record tending to show that, after Mr. Hobart first made the agreement of guaranty with plaintiff until the shot in controversy had been fired, any notice was given to plaintiff by defendant or any one in its behalf that defendant would not recognize an agreement of guaranty made by Mr. Hobart or Mr. Levy. Mr. Hobart testified that in the absence from the Portland office of the president of the defendant company, he, Hobart, was in charge. In his absence and that of the president, Mr. Levy was in charge thereof.

■ An agency need not be proved by direct evidence but may be shown by circumstances and the course of the dealing: *Cooperative Copper Co. v. Law,* 65 Or. 250, 253 (132 P. 521); *Bridenstine v. Gerlinger Motor Car Co.,* 86 Or. 411 (168 P. 73, 972).

■ We hold that under the testimony outlined above, the question of whether witness Levy as well as the question of whether witness Hobart had authority to make the alleged contract of guaranty, on behalf of defendant, became one of fact which should have been submitted to the jury: *Thomas v. Smith-Wagoner Co.*, 114 Or. 69 (234 P. 814); *Sherman Clay & Co. v. Buffum & Pendleton*, 91 Or. 352, 360 (179 P. 241); *Minard v. Stillman*, 35 Or. 259, 263 (57 P. 1022).

We feel justified in referring to the authorities cited in defendant's brief for the purpose of distinguishing them from the case at bar. In the cases of *Friedman & Sons v. Kelly*, 126 Mo. App. 279 (102 S. W. 1066); *Bagot v. Inter-Mountain Milling Co.*, 100 Or. 127 (196 P. 824); and *Connell v. McLoughlin*, 28 Or. 230 (42 P. 218), there were no former dealings between the parties.

In *Smith v. Campbell*, 85 Or. 420 (166 P. 546), the court held that testimony should have been received to the effect that defendant had said he would have the alleged agent look after it (referring to plaintiff's services) and that he had just put the agent's name in the writing. The court further held that this testimony, supplemented with testimony of an oral agreement with defendant himself, was sufficient to require the submission of the question of agency to the jury.

In *Wollenberg v. Sykes*, 49 Or. 163 (89 P. 148), the court held that it was the duty of the court to instruct as to what may be done by an agent when the character of his agency is shown. This rule was followed in *Baker v. Seaweard*, 63 Or. 350 (127 P. 961), in which case there was no conflict in the evidence as to the extent of the agency.

In *Jones v. Marshall-Wells Co.*, 104 Or. 388 (208 P. 768), the court construed documentary evidence which

comprised all of the testimony on the subject, except alleged statements of the agent, and held that the agent was restricted in his authority to soliciting orders for goods and submitting them to his principal for acceptance or rejection. The case of *Metropolitan Aluminum Manufacturing Co. v. Lau,* 61 Misc. Rep. 105 (112 N. Y. S. 1059), is an action on an oral contract with a salesman who took a written order signed by defendant containing the following clause:

"These goods are to be specially made, and this order is not subject to countermand after its acceptance by Metropolitan Aluminum Manufacturing Co. No special arrangements or promises of any kind by agents will be recognized, unless expressly written in this order and approved of by Metropolitan Aluminum Manufacturing Co."

This is a New York case. The concluding sentence in the opinion is as follows:

"Persons relying upon stipulations and promises made by agents varying or waiving the printed provisions in the contract do so at their own peril."

There is nothing in any of these cases which conflicts with the principles here applied.

The judgment of the circuit court is reversed and the cause remanded for such further proceedings as may not be inconsistent herewith.

BEAN, C. J., RAND and ROSSMAN, JJ., concur.